IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LAPORSCHE HOLLON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action No. 2:15cv464-WHA |
| | )           (wo) |
| DAS NORTH AMERICA, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment (Doc. #25), filed by Defendant DAS North America, Inc.

The Plaintiff filed a Complaint in this case on July 2, 2015, an Amended Complaint on November 23, 2015, and a Second Amended Complaint on February 16, 2016, bringing claims of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended (Count I) race discrimination (Count II), retaliation discrimination (Count III).

The court has federal question subject matter jurisdiction in this case. 28 U.S.C. §1331.

For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED.

**II. SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A),(B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

The Plaintiff, LaPorsche Hollon ("Hollon"), is an African-American woman who began working for Defendant DAS North America, Inc. ("DAS") in March of 2014. DAS is a manufacturer of seat components for automobiles. Assembly employees, of which Hollon was one, are referred to as Team Members. Team Members work during two shifts. There are different departments within DAS, including the Production Department and the Materials Department. Hollon began working in the Production Department. When she worked the day shift, Hollon was supervised by Stephanie Samuels, and when she worked the night shift she was supervised by John Washington ("Washington").

DAS has a Team Member Handbook which is provided to new employees at orientation. The Anti-Discrimination and Harassment Policy within the Handbook states that DAS considers harassment and discrimination in all forms to be a serious offense. (Doc. #27-2 at p.22). Team Members are told that they have a duty to report to the Human Resources Manager or any other member of Management any incidents of discrimination, including harassment or retaliation. Team Members are also provided a separate summary of the No Harassment Policy. (Doc. #27-2 at p.4). The No Harassment Policy states that every report will be fully investigated and corrective action will be taken, up to and including termination of employment. Hollon received a copy of the Team Member Handbook and the separate No Harassment Policy in 2012. (Doc. #27-2 at p.7).

In June of 2014, a DAS employee, George Williams ("Williams"), put money in Hollon's bag and told her he wanted to buy her lunch. Although Williams was a Manager, he was the

3

Material Department Manager, and was never Hollon's supervisor, never evaluated her work performance, and had no ability to demote, promote, or discipline Hollon. (Doc. #27-2 at p.6). From June 13 through June 18, 2014, Williams sent Hollon messages over Facebook in which he told Hollon that he was "feeling her," knew she was married, and he might be overstepping his boundaries, but wanted to be her "go to guy," and he called her pretty and told her not to forget him. On June 24, 2014, Williams told Hollon he had a job for her in the Materials Department, told her she looked good at a cookout, and said he wanted to "smash" her. On the same day, Williams told Hollon that he heard she had put in for a promotion, but she was not Team Leader material because she did not know how to use good judgment. On September 30, 2014, Williams told Hollon that she should watch out for Stephanie Samuels and Tyeisha Wooten ("Wooten"), DAS Human Resources Manager, because they had "something up their sleeves," and that if she had "come back there with" him, she would not be in that situation.

Hollon reported Williams's conduct to Wooten on September 30, 2014. Wooten told Hollon she would talk to Williams's boss. Wooten subsequently met with Patrick Kurdziel ("Kurdziel"), DAS's Operations Manager, who supervised Williams. On the same day, Kurdziel counseled Williams. Kurdziel states in an affidavit that he told Williams that his conduct was inappropriate, that DAS would not tolerate any hostile work environment or any exchange of favors between Williams and Hollon or any other hourly employee, and that DAS would not tolerate any hostile work environment. (Doc. #27-3).

On October 15, 2014, Williams provided DAS with a letter of resignation, stating that his last day would be October 24, 2014.

Hollon did not hear anything from Williams from September 30 until October 24, 2014.

4

On October 24, 2014, at 6:56 p.m., Williams sent Hollon a three-part text message laden with profanity, in which he told her that he had planned to stay on his last day to cuss her out, but had instead decided to let God deal with her; accused her of lying, told her that DAS would end up firing her, and referred to her "white boy" husband. (Doc. #27-14). In her deposition, Hollon testified that these messages were sent when Williams was no longer employed by DAS. (Doc. #27-1 at p.207:22-208:3). Upon receipt of these messages, Hollon contacted Wooten who told Hollon not to return to work until she called her. Wooten then called Hollon and told her that Williams was no longer in the building and that Wooten had told Williams that he did not need to text Hollon's phone again.

Hollon filed a charge of discrimination on November 20, 2014 based on the conduct by Williams.

In March of 2015, two male co-workers at DAS made comments and engaged in other conduct which Hollon viewed as racial and sexual harassment. On March 19, 2015, co-worker Michael Garland ("Garland") slapped Hollon on the buttocks and later made a crude and threatening comment of a sexual nature. In the affidavit attached to her EEOC charge, and in her discovery responses, Hollon stated that "on another occasions," also in March of 2015, Garland made racial references, referring to Hollon as a "cracker," and a sexual reference referring to the white race of her husband. (Doc. #30-2 at p.2; Doc. #30-3 at p.3). Also on March 19, another DAS co-worker, Javante Felder ("Felder"), made a crude comment about Hollon's crotch, and accused her of having a sexual relationship with a female co-worker.

Hollon did not work on March 20, 2015.

Hollon filed a second EEOC charge on March 24, 2015 for sex and race discrimination

5

based on the conduct of Felder and Garland.

Hollon did not report the conduct of Garland and Felder to DAS until March 26, 2015, after she filed her EEOC charge. (Doc. #27-1 at p. 245:3-12). At that time, she complained to her supervisor, Washington. (Doc. #27-1 at p.245:3-7). During Hollon's meeting with Washington, he discussed with her a Final Warning she received for absences.

Wooten received Hollon's second EEOC charge on March 27, 2015. On March 30, 2015, the next work day that the Production Department was in operation, Wooten began an investigation of the allegations in the second charge. (Doc. #27-2 at p.10).

Wooten terminated the employment of Garland on March 31, 2015.   (Doc. #27-2 at p.10). Wooten's investigation did not corroborate Hollon's accusations against Felder, but Wooten counseled Felder and reminded him of DAS's policies against workplace harassment. (Doc. #27-2 at p. 10).

Hollon reported to work on March 30 and March 31. She did not report to work on April 1, 2015, but instead went on a trip with her family. On April 1, 2015, Hollon received a threatening message on Facebook from Kya West, Garland's girlfriend.   Kya West is not a DAS employee.   Hollon reported the threat to Wooten and Wooten advised her to notify the authorities. Hollon also received a Facebook message from a La'Patrick Williams, whom she believed was actually her former co-worker, Williams, which referred to Hollon has having lied about another person.

Hollon voluntarily resigned her position at DAS on April 6, 2015. She contends that the conditions at DAS had grown so intolerable that she could not remain employed there. She then filed an EEOC charge on June 29, 2015.   In it she alleges discrimination based on sex and race,

and also retaliation.

## IV. DISCUSSION

### A. Hostile Work Environment

As noted, Hollon has brought hostile work environment claims based on race and gender-based harassment. The analytical framework for both claims is the same. That is, to establish a hostile environment claim, a plaintiff must show that: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) the employer was responsible for such environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir.2002).   In this case, DAS challenges Hollon's ability to prove the fourth and fifth elements of either her race or sex-based hostile environment claims.

**Element Four--Severe or Pervasive Conduct**

As to the element of sufficiently severe or pervasive harassment, an employee must subjectively perceive the harassment as sufficiently severe or pervasive to alter the terms or conditions of the employment, and this subjective perception must be objectively reasonable. *Mendoza v. Borden, Inc*., 195 F.3d 1238, 1246 (11th Cir.1999). In analyzing the objective component of these claims, the Supreme Court has held that courts should consider (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the plaintiff's job performance. *See id*. at 1246. "'[S]imple teasing,'

7

offhand comments, and isolated incidents (unless extremely serious)" are not sufficient to "amount to discriminatory changes in the 'terms and conditions of [a person's] employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (citation omitted).

1. Sex-Based Claim

Hollon's hostile environment on the basis of sex claim is based on the conduct of one co-worker during June, July, and September of 2014 and two other co-workers' conduct in March of 2015. (Doc. #30-1 at p.10). In her brief, she specifically relies on the following: Williams's Facebook messages and comments in June, July, and September implying that he wanted to have a sexual relationship with Hollon, Garland's comments and touching of Hollon's buttocks in March of 2015, and Felder's vulgar comment on March 19, 2015. (Doc. #30-1 at p.9-10).

Both parties have addressed together Williams's, Garland's, and Felder's conduct in analyzing severity and pervasiveness. DAS has also argued, however, that Hollon ought not be allowed to proceed on a claim based on Williams's conduct because she waited too long to complain about it, citing cases such as *Walton v. Johnson & Johnson, Serv*s., 347 F.3d 1272, 1289-90 (11th Cir. 2003). There is also precedent for dividing out evidence of harassment where an employer takes intervening action against one employee, so that that employee's actions are no longer considered as part of a hostile environment claim. *See Watson v. Blue Circle, Inc.*, 324 F.3d 1252 (11th Cir. 2003)(finding that where employer met with harasser and employee did not have additional issues with that harasser, that harasser's conduct was "no longer part" of the hostile environment claim).

In this case, after Williams's conduct was reported by Hollon in September, DAS counseled him, and Williams resigned from employment in October. It is undisputed that Hollon

8

did not experience any inappropriate conduct from Williams between October of 2014 and March of 2015, and that the instances of harassment she has identified in March of 2015 were perpetrated by persons other than Williams. The contact in April of 2015 which Hollon contends was from Williams occurred well after Williams was no longer employed by DAS. This case, therefore, appears to fit within the reasoning of case law noted above which would not consider Williams's conduct to be part of the hostile environment claim.

If only Garland's and Felder's conduct in March of 2015 is considered, there were inappropriate comments on a single day in March by both employees, unwelcome touching by one of those employees on that same day, and additional comments by one of the employees at an unspecified time in the same month. This conduct is not sufficiently severe or pervasive to constitute a hostile work environment. *See Mendoza v. Borden, Inc*., 195 F.3d 1238, 1245 (11th Cir.1999) (finding insufficient evidence where there was the comment "I'm getting fired up"; the purported harasser rubbed his hip against the plaintiff's hip while touching her shoulder and smiling; made a sniffing sound while looking at the plaintiff's groin; and there was "constant" following and staring at the plaintiff in a "very obvious fashion."). Summary judgment is due to be GRANTED on that basis.

Even considering Williams's conduct along with that of Felder and Garland, the evidence in this case is not more severe or pervasive as the conduct identified in *Mendoza*. Williams made sexual overtures to Hollon on Facebook over a few days, said he liked the way she looked on one occasion, said he wanted to "smash" her, made comments about her ability to become a Team Leader, asked her to work in his department, and gave her money. Considering together all of the evidence of the inappropriate conduct and remarks based on gender made by Williams, Garland,

9

and Felder, the court must conclude that Hollon has not shown an objectively pervasive or severe hostile work environment, because the comments were sporadic, not every day, and the comments and conduct of Williams was separated in time by many months from the comments and conduct of Garland and Felder. The evidence presented also does not rise to the level of severity recognized by the Eleventh Circuit. *See Guthrie v. Waffle House, Inc*., 460 F. App'x 803, 805 (11th Cir. 2012) (alleged harassment by a supervisor and a co-worker in the form of "a few dozen comments or actions" spread out of over eleven months, which included using crude language, asking the plaintiff on a date 10 to 20 times, kissing the plaintiff on the cheek, grabbing her buttocks two to five times, and putting an arm around her shoulders was not sufficiently objectively severe or pervasive)*; compare Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238 (11th Cir.2004) (finding sufficient severity in a male coworker's conduct toward the female plaintiff involving "many direct as well as indirect propositions for sex," including "following her into the restroom, and repeated attempts to touch her breasts, place his hands down her pants, and pull off her pants," as well as "enlisting the assistance of others to hold her while he attempted to grope her."). Summary judgment is, therefore, due to be GRANTED as to her sexual harassment claim for failure to establish the fourth element of her claim.

2. Race-Based Claim

In support of her racial harassment case, Hollon has pointed to a comment by Williams about her "white boy" husband made on one occasion in October of 2014, and states that on "other occasions" in March of 2015, Garland called her a "cracker" and made reference to the white race of her husband. While referring to Hollon as a "cracker," and her husband as a "white boy," may have been using a racial slur, the comments are sporadic, rather than being

"commonplace." *EEOC v. Beverage Canners, Inc*., 897 F.2d 1067, 1068 (11th Cir. 1990).   The comments also do not rise to the level of severity recognized by the Eleventh Circuit. *See, e.g*., *McCann v. Tillman*, 526 F.3d 1370, 1378-79 (11th Cir. 2008) (stating that the "instances of racially derogatory language alone, extending over a period of more than two years, are too sporadic and isolated to establish that her employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment. As the district court properly found, the only term ever directed at McCann was "girl" and the term "boy" was used only once in front of her). The court cannot conclude that Hollon has created an issue of fact as to racial harassment. Summary judgment is due to be GRANTED on that basis.

### Element Five--Employer Liability

The court has concluded that element four—severity or pervasiveness—has not been established as to either of Hollon's hostile environment claims and that summary judgment is due to be granted as to the claims on that basis. Alternatively, summary judgment is also due to be granted on the basis of Hollon's inability to establish element five of her hostile environment claims.

There is a particular test for employer liability under the fifth element of employer liability when the purported harasser is a co-employee rather than a supervisor. *Terry v. Laurel Oaks Behavioral Health Ctr., Inc*., 1 F. Supp. 3d 1250, 1266 (M.D. Ala. 2014).   There is no dispute in this case that Williams, Felder, and Garland were Hollon's co-workers. (Doc. #30-1 at p.9). When the sexual harasser is a co-worker, "an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior." *Vance v. Ball State Univ*., ––– U.S. –––, 133 S.Ct. 2434, 2441 (2013). Employer liability based

on the actions of co-workers requires a showing of negligence. *Vance*, 133 S.Ct. at 2441. A plaintiff must show that the employer knew or should have known of the harassing conduct, but failed to take prompt remedial action. *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287 (11th Cir. 2007). "Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where the harassment was so severe and pervasive that management should have known of it." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002). The factors relevant to constructive notice are the remoteness of the location of the harassment as compared to the location of management, whether the harassment occurs intermittently over a long period of time, whether the victims were part-time or full-time employees, and whether there were only a few, discrete instances of harassment. *Miller*, 277 F.3d at 1278-79.

      Hollon argues that DAS knew or should have known of harassment and failed to take proper remedial action in response to her complaints. Hollon appears to argue that DAS should have known of the conduct by Felder and Garland because of the conduct by Williams. Hollon also argues that because Williams contacted Hollon after he was counseled, on the last day of his employment, and Kurdziel, when he counseled Williams, did not tell him to refrain from communicating with or being in contact with Hollon, DAS did not adequately remedy the harassment. Hollon further argues that DAS's policy was not effective because it was not applied consistently in that Garland was terminated because he had engaged in comments of a sexual nature, but Williams was not.   Hollon further argues that Wooten, not a supervisor, counseled Felder.

      DAS argues that it undisputed that it had an anti-harassment policy in place and Hollon

has pointed to no evidence which would demonstrate that DAS should have known of any harassing conduct before Hollon complained of it. DAS also argues that every time it became aware of a complaint by Hollon about an employee, DAS investigated and counseled the employee about DAS's policies, and Hollon did not experience further harassment from that employee.

Applying the constructive notice analytical factors, the court concludes that the conduct pointed to in this case is not severe or pervasive enough to have alerted DAS to it before Hollon complained. *See Miller*, 277 F.3d at 1278. The challenged conduct occurred intermittently, with the majority of the conduct in March occurring on one day, and with no conduct occurring between October of 2014 and March of 2015.

DAS had an anti-discrimination policy in place, which was made known to Hollon, and which Hollon used so that DAS had actual knowledge of complaints of harassment. (Doc. #27-2 at p.5). As to the issue of DAS's response to Hollon's complaints, DAS points out that after being counseled, Williams did not contact Hollon again until after he left his employment in October of 2014. DAS has presented Hollon's deposition testimony that at the time Williams called Hollon in October of 2014 and threatened her, he was no longer employed by DAS. (Doc. #27-1 at p.207:22-208:3).[1] DAS also relies on Hollon's deposition testimony in which she stated that the only conduct from Williams after she complained was the phone call after he quit. (Doc. #27-1 at p.242:19-243:4).

---

[1] Although Hollon attempts to create a question of fact as to Williams's employment status by arguing that Wooten would not have called a person who is not an employee, there is no affirmative evidence to contradict Hollon's deposition testimony that Williams was no longer employed by DAS at the time he communicated with her in October of 2014.

With respect to Garland, Hollon complained about his conduct and, in response, DAS terminated Garland's employment. DAS points to Hollon's deposition testimony in which she states that she did not see Garland after March 30. (Doc. #27-1 at p.258:8-9). Hollon also agreed in her deposition that the only thing she has "got against Mike [Garland] or against Javante [Felder]," is what took place on March 19. (Doc. #27-1 at p.265:14-16). The court has been cited to no evidence to create a question of fact as to whether Williams, Garland, or Felder engaged in additional misconduct while employed at DAS after Hollon complained about them to DAS and DAS counseled them, or took additional action.

"There is no set or bright-line test for determining when an employer has discharged its Title VII obligations to investigate sexual harassment complaints." *Williams v. Russell Corp.*, 218 F. Supp. 2d 1283, 1294 (M.D. Ala. 2002) (citing *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298 (11th Cir. 2000)). Whether an employer's response is sufficient depends on, among other things, the effectiveness of the steps taken, and whether it was reasonably likely to prevent the misconduct from recurring. *Id.*

As noted above, Hollon makes other critiques of DAS's actions in response to her complaints, but she does not present evidence that Williams, Felder, or Garland continued to engage in objectionable conduct toward Hollon while they were employed at DAS. *Williams*, 218 F. Supp. at 1294 (stating that because employer investigated promptly, took reasonable actions, and because the conduct complained of stopped completely, the employer's remedial efforts were both adequate and effective). The mere fact that Williams was not terminated and Garland was does not create a question of fact as to the efficacy of DAS's response. *See Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir.1997) ("Although [plaintiff]

14

remains unsatisfied with [defendant's] resolution of her complaint, we have never stated—nor does [plaintiff] propose that we have ever held—that a complainant in a discrimination action has a right to the remedy of her choice."). Hollon has failed to present sufficient evidence to create a question of fact as to whether DAS took prompt remedial action when it knew of Hollon's complaints of harassment. Accordingly, summary judgment is due to be GRANTED as to Hollon's hostile environment claims on the alternative basis that she has failed to present sufficient evidence to create a question of fact as to the fifth element of her hostile environment claims.

B. Constructive Discharge

Hollon's constructive discharge claim is a claim for "retaliatory constructive discharge." (Doc. #30-1 at p.20). To establish a prima facie case of retaliation under 42 U.S.C. § 2000e-3(a), a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir.1998).

Hollon does not address the first element, her protected activity, in her brief, but, in her Second Amended Complaint, Hollon states that after the filing of her first EEOC charge on November 20, 2014, DAS allowed male employees to subject her to harassment, which was a form of retaliation by DAS. (Doc. #18 at ¶28). Her protected activity, therefore, is her November 2014 EEOC charge.[2]

Hollon's constructive discharge theory as stated in her brief is that two threats she

---

[2] Hollon has not alleged or argued that her final EEOC charge, or her complaint to Washington, based on Felder and Garland's conduct in March of 2015, is the protected activity upon which her constructive discharge claim is based.

received in April, combined with acts of sex and race-based harassment, caused her to perceive that DAS did not care "what was happening to her," and she resigned because working conditions had become intolerable. (Doc. #30-1 at p.20). Hollon's theory is a unique one, in that the adverse employment action she has pointed to is constructive discharge based on acts of sexual and racial harassment by DAS employees, and on threats of non-employees, under a theory that those actions were allowed by her employer as retaliation.

"A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.' " *Fitz v. Pugmire Lincoln-Mercury, Inc*., 348 F.3d 974, 977 (11th Cir. 2003) (citation omitted). Harassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 148 (2004). Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case. *Suders*, 542 U.S. at 149.   The plaintiff's subjective feelings about her employer's actions are not the standard, but instead the standard is whether a reasonable person in her position would be compelled to quit. *Doe v. Dekalb Co. Sch. Dist*., 145 F.3d 1441, 1450 (11th Cir.1998).

It does not appear to the court that this standard has been met in this case.   There is no evidence a girlfriend of a terminated employee, or, assuming that La'Patrick Williams is Williams, a former employee, threatened Hollon to advance a retaliatory motive by DAS. *See Stoner v. Arkansas Dept. of Corr*., 983 F. Supp. 2d 1074, 1089, 1102 (E.D. Ark. 2013) (noting that plaintiff claiming third-party retaliation made no arguments as the employer's retaliatory intent).

Even assuming that Hollon can establish constructive discharge, however, she must also create a question of fact as to causation. Causation can be shown through close temporal proximity between the statutorily protected activity and the adverse employment action. *See Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798-99 (11th Cir. 2000). But mere temporal proximity, without more, must be "very close." *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007). In the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law. *Id.* A three to four-month disparity between the statutorily protected expression and the adverse employment action is not enough. *See id.*

As noted, in her Second Amended Complaint Hollon identifies her first EEOC charge in November of 2014 as her protected activity. DAS's actions concerning Williams's acts in June, July, September, and October, therefore, cannot be causally related to her EEOC Charge in November because they preceded that activity. *See, e.g., Clover v. Total Sys. Servs., Inc*., 176 F.3d 1346, 1354 (11th Cir. 1999) (stating that employer must be actually aware of the protected expression at the time it took adverse employment action); *Williams v. Russell Corp*., 218 F. Supp. 2d 1283, 1297 (M.D. Ala. 2002) (stating that disciplinary action was not in retaliation for her EEOC charge because the discipline happened nine days before the EEOC charge was filed).

Other actions relied upon by Hollon which followed the initial EEOC charge were comments and conduct of Felder and Garland, two employees, in March of 2015, and two threats in April 2015 by persons who were not employed by DAS. The April threats were a Facebook message from Garland's girlfriend and a message from La'Patrick Williams, whom Hollon contends was actually Williams.

Even considering all of the conduct pointed to as evidence relevant to a retaliatory constructive discharge claim, and assuming for purposes of analysis that the evidence Hollon has pointed to would constitute an adverse employment action under the applicable standard, *Suders*, 542 U.S. at 149, these events occurred in March and April of 2015. Without other evidence, conduct occurring in March and April of 2015 is too attenuated from protected activity in November of 2014 to establish a causal connection. *Thomas*, 506 F.3d at 1364.   Therefore, the court agrees with DAS that Hollon has failed to establish a causal connection between the alleged constructive discharge and the protected activity of Hollon's November of 2014 EEOC charge. Summary judgment is due to be GRANTED on that basis.

## V. CONCLUSION

For the reasons discussed, the Motion for Summary judgment (Doc. #25) is due to be and is hereby ORDERED GRANTED.   A Final Judgment will be entered in accordance with this Memorandum Opinion.

Done this 26th day of August, 2016.

/s/ W. Harold Albritton
W.   HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE